# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STEPHANIE DEJESSE, | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 06-1682 |
| FIRST JUDICIAL DISTRICT OF PENNSYLVANIA, | : | |
| Defendant. | : | |
| | : | |

## Memorandum and Order

YOHN, J.                                                   December ___, 2007

Stephanie DeJesse brought this suit against the First Judicial District of Pennsylvania ("FJD"), her former employer, alleging that the FJD discriminated against her because of her disability.[1]  Plaintiff's has moved for summary judgment on Count I, which alleges violations of Section 504 of the Rehabilitation Act, 29 U.S.C. § 793 *et seq.* ("Section 504").  As explained below, I will deny this motion

## I.      Factual Background[2]

---

[1] Plaintiff's amended complaint included three counts.  Count II, alleging violations of her right to due process pursuant to the Fourteenth Amendment, and Count III, alleging violations of the Americans with Disabilities Act, 42 U.S.C. § 12111 *et seq.*, were dismissed. *See DeJesse v. First Judicial Dist.*, No. 06-1682, 2007 U.S. Dist. LEXIS 16907 (E.D. Pa. Jan. 30, 2007).

[2] When a court evaluates a motion for summary judgment, "[t]he evidence of the non-movant is to be believed."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Furthermore, "all justifiable inferences are to be drawn in [the non-movant's] favor."  *Id.*  Here, the non-movant is the FJD, and the FJD disputes almost all of plaintiff's statements of

1

Plaintiff was hired by the FJD's traffic court in 1993 and thereafter began work as an administrative secretary for the deputy court administrator.  (DeJesse Dep. 11:24-13:17, July 13, 2007.)  Plaintiff later served as an administrative secretary for the administrative judge for the traffic court, Fortunato Perry.  (*Id.* 19:14-20:13.)  In late 2002, when Judge Francis Kelly assumed the administrative judge responsibilities, he kept only two of Judge Perry's four secretaries.  Plaintiff was transferred to the customer service department and worked at a counter in the lobby.  (*Id.* at 20:19-22:6.)  Plaintiff began missing work shortly after this transfer.  (*See* Def.'s App. in Opp'n to Pl.'s Mot. for Summ. J. Ex. 20.)

In support of her claim that she is disabled, plaintiff has asserted that she suffers from "adult autoimmune (idiopathic) thrombocytopenic purpura ("ITP"),[3] cirrhosis of the liver,[4]

---

"undisputed" fact.  (*See* Def.'s Mem. Opp'n to Pl.'s Mot. Summ. J. 1.)  I must accept the FJD's version of the facts as true for purposes of this motion.

[3] "Thrombocytopenic purpura" is defined as "any form of purpura in which the platelet count is decreased."  *Dorland's Illustrated Medical Dictionary* 1580 (31st ed. 2007).  "Purpura" is "any of a group of conditions characterized by ecchymoses or other small hemorrhages in the skin, mucous membranes, or serosal surfaces; causes include blood disorders, vascular abnormalities, and trauma" or "any of several conditions similar to the traditional purpura group, which may be caused by decreased platelet counts, platelet abnormalities, vascular defects, or reactions to drugs."  *Id.*

[4] Cirrhosis is "any of a group of chronic diseases of the liver characterized by loss of normal lobular architecture with fibrosis, and by destruction of parenchymal cells and their regeneration to form nodules."  *Id.* at 371.

anemia,[5] low platelets,[6] interstitial lung disease,[7] rhinitis,[8] and other related conditions.[9]"
(Compl. ¶ 15; Pl.'s Mem. Supp. Pl.'s Mot. Summ. J. 7 (footnotes added).)  For some time, her
ITP had been in remission, but it recurred in 2003.[10]  (DeJesse Dep. 29:14-23.)  In late March
2003, she "found black and blues" on her body, her "weight was very low," and her "[iron and
platelet] levels . . . were all off again."  (*Id.* at 43:10-16.)  She was diagnosed with ITP on April
2, 2003.  (*Id.* at 43:22-23.)  Around that time, she was "very tired," "very weak," and "very
scared."  (*Id.* at 44:6, 45:9, 45:10.)  She had to be "very careful" because of the risk of bleeding,
although bleeding never happened.  (*Id.* at 45:13-15.)  She was prescribed a steroid[11] and had
"further testing."  (*Id.* at 46:5-9.)  At this time, however, she "had not changed [her] activities or
lifestyle in any way" and "always did [her] job."  (*Id.* at 46:10-23.)  At some later point, plaintiff
began to feel that she could no longer work because she "was starting to feel very, very bad, very

---

[5] Anemia is "a reduction below normal in the concentration of erythrocytes or hemoglobin in the blood."  *Id.* at 79.

[6] Plaintiff testified that her low platelet count is associated with ITP.  (DeJesse Dep. 87:5-7.)

[7] Plaintiff testified her doctors referred to this disease as "sarcoidosis."  (DeJesse Dep. 87:8-88:1.)  Sarcoidosis is "a chronic, progressive, systemic granulomatous reticulosis of unknown etiology, characterized by hard tubercles."  *Dorland's*, *supra*, at 1693.

[8] Rhinitis is "inflammation of the mucous membrane of the nose."  *Id.* at 1664.  When asked about rhinitis at her deposition, plaintiff responded, "I don't know what that is."  (DeJesse Dep. 88:21.)  When asked if it was "ever something you were told you had," she replied, "I don't know what that is.  I have no idea."  (*Id.* at 88:22-89:1.)

[9] Plaintiff denied actually having any "other related conditions."  (*Id.* at 89:2-23.)

[10] Defendant points out that plaintiff's medical records indicate that her diagnosis of ITP was called into question after a bone marrow biopsy.  (*See* Def.'s Resp. to Pl.'s Statement of Undisputed Facts ¶ 1.)

[11] Plaintiff was prescribed prednisone.  (*See, e.g.*, Def.'s App. Ex. 4.)

weak, very cold." (*Id.* at 48:5-12.)  She began seeing "three different doctors, a lung [doctor,

Michael P. Casey, M.D.], a hematologist[, David P. Mintzer, M.D.,] . . . and a liver doctor[,

Frederick A. Nunes, M.D.]" (*id.* at 49:2-5), in addition to her "family doctor," Frank Mazzatto,

M.D. (*id.* at 64:4-18).  She applied for leave under the Family and Medical Leave Act, 29 U.S.C.

§ 2601 *et seq.* ("FMLA"), because "[her] condition had gotten worse. . . . It was . . . very hard for

[her] to function normally." (*Id.* at 53:4-14.)  She was "very tired," "very weak," and "would

fall—would take naps throughout the day." (*Id.* at 53:15-17.)  But, other than the symptoms

described above, she had no physical limitations in September 2003.  (*Id.* at 54:8-11.)  On

September 18, 2003, she visited Dr. Mintzer for a "[n]ew patient consultation" and "second

opinion."  (Def.'s App. Ex. 4.)  Dr. Mintzer noted her diagnosis in 2000 of "mild" ITP.  He also

noted that she had been restarted on prednisone when her ITP recurred, started to wean off the

prednisone in June 2003, and was no longer taking prednisone as of the date of the office visit.[12]

(*Id.*)  The report stated that plaintiff suffered from "fatigue," but had "no weight loss, no fever,

appetite normal." (*Id.*)  Furthermore, she was "[a]ble to carry on normal activity" and had

"minor signs and symptoms of disease."[13]  (*Id.*)

     Plaintiff had begun using her FMLA leave on August 18, 2003.  (Def.'s App. Ex. 20.)

Plaintiff was in touch with FJD employees while she was on FMLA leave prior to November 17,

---

    [12] Other doctors' notes report a slightly different date on which plaintiff stopped taking prednisone.  (*See, e.g.*, Def.'s App. Ex. 8 (noting that plaintiff was "treated with [p]rednisone until November 2003").)

    [13] Notwithstanding these records, plaintiff testified that from mid-August 2003 until December 2003 or January 2004 she had limitations with respect to walking, sleeping, and performing manual and household tasks because of fatigue and stress.  She also testified that she had problems eating because of the steroid.  Plaintiff's descriptions of these limitations are detailed in Part III.A.1, *infra*.

2003.  Plaintiff testified that she spoke with both a traffic court personnel officer, Anna

D'Emilio, and her supervisor, Jeffrey Travelina, during that time.  (*See* DeJesse Dep. 197:14-

199:19, 107:9-108:20.)  The specific number and type of contacts between the FJD and her are

unknown and contested, however.  (Def.'s Resp. to Pl.'s Facts ¶ 122.)

      While plaintiff was on FMLA leave prior to November 17, 2003, she submitted the

following medical certification forms, all of which relate only to her condition prior to that date:

•       On September 29, 2003, the personnel office received a form signed by Dr. Mazzatto and

      plaintiff, dated September 20 or 29, 2003.  (Def.'s App. Ex. 7.)  The form noted

      plaintiff's diagnosis of "ITP—Sarcoidosis" and explained that "much testing has been

      done, lung testing continues on [T]hursday."  (*Id.*)  The form also noted that plaintiff

      "may return to work with no restrictions."  (*Id.*)

•       On October 8, 2003,[14] the personnel office received a form signed by Dr. Casey and

      plaintiff, dated October 6, 2003 and October 3, 2003, respectively.  (DeJesse Dep. Ex. 3.)

      The form reported that plaintiff "has interstitial lung disease," that "[b]iopsy results are

      pending," and that plaintiff "may not be expected to return to work until October 26,

      2003."  (*Id.*)

•       On November 10, 2003, the personnel office received a form signed by Dr. Casey and

      plaintiff, dated October 22, 2003.  (Def.'s App. Ex. 24.)  This form reported that

      plaintiff's return-to-work date was "unknown" and that her prognosis was "[g]uarded."

      (*Id.*)

---

      [14] The month on the date stamp is not clear, but given the dates of the signatures, October
is the most likely month this form was received.

- On November 10, the personnel office also received a form signed by Dr. Casey (but not signed by plaintiff), dated October 29, 2003. (Def.'s App. Ex. 5.) The form noted that plaintiff had a "[c]hronic [c]ondition[] [r]equiring [t]reatment," that plaintiff was "currently incapacitated," and that the "likely duration" of her incapacity was until mid-November 2003. (*Id.*)

On October 30, 2003, Thomas Bly, director of human resources for the FJD, sent plaintiff a letter ("the October 30 letter") advising that her "request for unpaid family Medical Leave was approved for the period September 30, 2003 to November 17, 2003." (Def.'s App. Ex. 22.) The letter specified that she was expected back at work on November 18, 2003. (*Id.*) Furthermore, the letter explained that, if she would be unable to return on November 18, 2003, she could "request an unpaid Medical Leave of Absence" by submitting a "written request, along with medical certification" to her supervisor as soon as practicable.[15]  (*Id.*)

Plaintiff testified that it was not her intention to return to work on November 18, 2003, "[b]ecause [her] doctor still ha[d]n't released [her] to go back to work." (DeJesse Dep. 110:18-111:2.) Defendant points out, however, that "[t]here is nothing in [p]laintiff's medical records to indicate that she had not been cleared to return to work on November 18, 2003." (Def.'s Resp. to Pl.'s Facts ¶ 124.) To the contrary, Dr. Casey, the physician who was supposedly keeping plaintiff out of work (*see* DeJesse Dep. 75:3-6), authored a letter dated October 30, 2003 in

---

[15] The relevant part of the letter stated in full:

> If you are not able to return to duty on November 18, 2003, you may request an unpaid Medical Leave of Absence. This written request, along with medical certification, must be submitted to your supervisor as soon as practicable so that approval can be sought through appropriate administrative channels before the expiration of your approved leave.

(*Id.*)

which he reported that plaintiff "currently feels fine" and that the "best course of action right now is simple expectant follow up." (*See* Def.'s App. Ex. 2.) Similarly, by the end of her FMLA leave in mid-November 2003, plaintiff's medical records reflect that she felt fine and her energy level was good. (*See* Def.'s App. Ex. 2 (letter from Dr. Casey to Dr. Mintzer (Oct. 30, 2003) (reporting that "[t]he patient currently feels fine")), Ex. 3 (patient note by Dr. Mintzer (Nov. 6, 2003) (reporting that plaintiff "[f]eels fine" and "energy level good"), Ex. 6 (patient note by Dr. Mintzer (Nov. 25, 2003) (same).)

In response to the October 30 letter, plaintiff scheduled a meeting with Mary Connaire, the FJD human resources employee in charge of benefits, to discuss the calculation of plaintiff's FMLA benefits.[16] (*See* Woodley Dep. 48-49; Def.'s App. Ex. 23.) Crystal Woodley, the FJD human resources employee who oversaw family medical leave, also attended the meeting. According to a memo written by Woodley and dated November 18, 2003, at the meeting she explained to plaintiff that "her FMLA expired on 11/18 + she will need Judge Kelly's sign" (Def.'s App. Ex. 23), presumably meaning she would need Judge Kelly's signature granting her request for extended leave. Woodley noted that plaintiff "indicated that she is waiting for Judge Kelly's signature" (*id.*), and testified that she assumed plaintiff meant that she had already submitted the letter to Judge Kelly (Woodley Dep. 84:12-16). Woodley also testified that at the meeting she discussed with plaintiff the need for medical certification to support her request for extended leave. (*Id.* at 50:20-52:5, 82:2-16.) No certification form was given to plaintiff during the meeting, but if plaintiff had asked for a form, Woodley would have provided her with one.

_____

[16] Whether this meeting occurred on November 17 or November 18, 2003 is unclear. (*See* Woodley Dep. 73:20-74:14, July 17, 2007.)

(*Id.* at 86:4-87:2.)

After the meeting, plaintiff typed a letter and, on November 17, 2003 delivered it to Judge

Kelly ("plaintiff's November 17 letter"). (DeJesse Dep. 119:11-13.) She handed it to Judge

Kelly's receptionist, Ann Berrner. (*Id.* at 135:2-6.) The letter reads, in its entirety, as follows:

> I have been notified that as of November 18, 2003, I have utilized my Family
> Medical Leave. At this time, my medical testing has not been completed, so the
> doctors have not determined the reason for my illness. Since the time I have been out
> of work, I have been sending the Personnel Department the necessary forms
> completed by my doctors.
> On Wednesday,[17] I am scheduled to have a liver biopsy, to help determine my
> illness.
> At this time, I would like to request an extension for leave until the outcome
> of my test.
> Should any further information be needed, please advise.
> Thank you for your consideration in this matter.

(Def.'s App. Ex. 9 (footnote added).)

The FJD did not have a clear understanding of the amount of leave plaintiff was

requesting. Woodley testified that "everyone thought [plaintiff's leave] would be a few days."

(Woodley Dep. 66:15-21.) Judge Kelly testified that he understood plaintiff to be requesting a

month of leave. (Kelly Dep. 46:7-20, July 26, 2007; *see also* D'Emilio Dep., July 17, 2007, Ex.

7.) The FJD also did not understand the nature of plaintiff's condition. (*See* D'Emilio Dep.

125:16-21, 136:8-24; Fenerty Dep. 21:22-25:2; Kelly Dep. 33:13-35:8.)

On November 25, 2003, plaintiff received the results of her liver biopsy. (*See* Def.'s

App. Ex. 6; DeJesse Dep. 156:20-157:2.) Dr. Mintzer reported "[c]irrhosis on recent biopsy of

unclear cause." (*Id.*) Dr. Mintzer also noted that on that date plaintiff was "[o]ff steroids,"

---

[17] The biopsy was performed on Wednesday, November 19, 2003. (Def.'s App. Ex. 17; DeJesse Dep. 125:6-16.)

"[f]eels fine," and that her "energy level [was] good." (*Id.*)  He further noted that she was

consuming alcohol "[s]ocially."[18] (*Id.*)  Plaintiff also saw Dr. Nunes on November 25, 2003

regarding her biopsy results.  (Def.'s App. Ex. 8.)

Plaintiff did not return to work after receiving her biopsy results on November 25, 2003.

Instead, she testified that she did not feel well enough to return to her job (or any job) until "the

end of January" 2004.  (DeJesse Dep. 190:10-191:6; *see also id.* at 72:3-7 (testifying that

plaintiff was "initially cleared to go back to work" by Dr. Nunes at "the end of February" 2004).)

She also testified that she "always asked [her doctors] when [she] c[ould] go back [to work], and

they wanted to continue the testing."  (*Id.* at 72:20-73:2.)

According to the FJD, plaintiff did not contact the FJD again after November 17, 2003.[19]

(D'Emilio Dep. 72:2-73:8, 78:22-79:9; Fenerty Dep. 54:2-11, July 19, 2007; Kelly Dep. 42:11-

15, 43:23-44:19; 76:9-22.)  And the FJD did not contact plaintiff.  (D'Emilio Dep. 139:10-16;

Fenerty Dep. 70:15-20; Kelly Dep. 55:21-56:3; Woodley Dep. 69:15-22, 73:5-10, 108:7-21;

114:23-116:20.).

Meanwhile, the FJD employees in the human relations office were apparently waiting to

hear from either plaintiff or Judge Kelly.  Soon after November 17, 2003, D'Emilio asked

Margaret Fenerty, Judge Kelly's chief of staff, whether Judge Kelly had made a decision in

response to plaintiff's November 17 letter.  (D'Emilio Dep. 81:3-16.)  She also e-mailed Fenerty

---

[18] Another doctor reported, however, that as of that date plaintiff "does not drink alcohol." (Def.'s App. Ex. 8.)  Plaintiff testified that she was not permitted to drink alcohol while taking the steroid.  (DeJesse Dep. 97:18-21.)

[19] Plaintiff testified that she was in contact with FJD employees after November 17, 2003. (DeJesse Dep. 131:23-141:12.)

9

on November 25, 2003, asking about the "status" of plaintiff.  (Fenerty Dep. 65:18-66:4.)

Fenerty replied that she did not know plaintiff's status, and Fenerty gave the e-mail to Judge

Kelly.  (*Id.* at 66:5-25, 67:4.)  Judge Kelly testified that he "expected to hear from her. . . . [w]hat

the status of her situation was[,] whether she was coming back."  (Kelly Dep. 49:23-50:9.)

Further, in response to a question about his understanding of whether plaintiff was required to

submit medical certification after November 17, 2003, Judge Kelly testified:  "My understanding

is that we were still waiting to find out where—it was unresolved.  So I didn't know, . . . it was

just . . . in a limbo.  It was just unresolved . . . ."  (*Id.* at 53:8-16.)

The first communication plaintiff received from the FJD after November 17, 2003 was a

letter dated February 3, 2004 informing her that her employment had been terminated as of

January 5, 2004.[20]  (D'Emilio Dep. Ex. 9.)  That letter was sent to plaintiff in response to a

memorandum from Judge Kelly to the FJD's director of human resources dated January 5, 2004.

(Def.'s App. Ex. 25.)  Judge Kelly wrote:

> In November, 2003, Ms. DeJesse submitted a letter to me to request an additional
> month of time without pay while she awaited medical analysis. . . .
>         As of January 5, 2004, no further communication from Stephanie DeJesse has
> been forthcoming and, therefore, we must remove her from the payroll.
>         I trust you will notify her of our action.

(*Id.*)  Prior to the time this letter was sent, Judge Kelly would have accepted plaintiff back at

work had she contacted him or the FJD to request reinstatement.  (Kelly Dep. 66:3-68:4.)

---

[20] Plaintiff's time from November 18, 2003 through January 2, 2004 was accounted for by
the FJD as an approved medical leave of absence.  (D'Emilio Dep. Ex. 10.)  This was done
because the FJD was required by the City of Philadelphia's payroll department to account for
plaintiff's unpaid time off before it could process plaintiff's termination.  (Woodley Dep. 95:10-
96:19.)

On April 21, 2006, plaintiff filed this suit seeking money damages against the FJD,[21] and

on September 17, 2007, she filed the instant motion for summary judgment.


## II.    Standard of Review

A motion for summary judgment will be granted only "if the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to judgment

as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of showing

that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986).  Once the moving party has met its initial burden, the non-moving party must present

"specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v.

Zenith Radio Corp.*, 475 U.S. 574, 585 n.10 (1986) (quoting Fed. R. Civ. P. 56(e)).  "Facts that

could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a

rational person could conclude that the position of the person with the burden of proof on the

disputed issue is correct." *Ideal Dairy Farms, Inc. v. John Lebatt, Ltd.* 90 F.3d 737, 743 (3d Cir.

1996) (quoting *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir.

1995)).  The non-movant must present concrete evidence supporting each essential element of its

claim. *Celotex*, 477 U.S. at 322-23.  The non-movant must show more than "[t]he mere

existence of a scintilla of evidence" for elements on which he bears the burden of production.

*Anderson*, 477 U.S. at 252.  Thus, "[w]here the record taken as a whole could not lead a rational

---

[21] The FJD has not raised a statute of limitations defense in connection with this motion
or a counter-motion for summary judgment.

trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita*,

475 U.S. at 587.


### III.    Discussion

Plaintiff claims she was discriminated against in violation of Section 504.[22]  In relevant

part, Section 504 provides as follows:  "No otherwise qualified individual with a disability . . . ,

shall, solely by reason of her or his disability, be excluded from the participation in, be denied the

benefits of, or be subjected to discrimination under any program or activity receiving Federal

financial assistance . . . ."[23]  29 U.S.C. § 794(a).  To make out a prima facie case of

discrimination under Section 504, an employee must show:

> (1) that he or she has a disability, (2) that he or she is otherwise qualified to perform
> the essential functions of the job, with or without reasonable accommodations by the
> employer; and (3) that he or she was nonetheless terminated or otherwise prevented
> from performing the job.

*Shiring v. Runyon*, 90 F.3d 827, 831 (3d Cir. 1996).  Further, "[t]he plaintiff must make a prima

---

[22] The standards applicable in disability discrimination cases brought pursuant to Section
504 are the same as the standards applicable to cases brought pursuant to the ADA.  *See
McDonald v. Pa. Dep't of Pub. Welfare*, 62 F.3d 92, 95 (3d Cir. 1995) ("Whether suit is filed
under the Rehabilitation Act or under the Disabilities Act, the substantive standards for
determining liability are the same." (citing *Myers v. Hose*, 50 F.3d 278, 281 (4th Cir.1995)); *see
also* 29 U.S.C. § 794(d) ("The standards used to determine whether [the Rehabilitation Act] has
been violated in a complaint alleging employment discrimination . . . shall be the standards
applied under title I of the [ADA] and the provisions of sections 501 through 504, and 510, of the
[ADA], as such sections relate to employment."); 42 U.S.C. § 12201(a) ("Except as otherwise
provided in [the ADA], nothing in this chapter shall be construed to apply a lesser standard than
the standards applied under title V of the Rehabilitation Act . . . or the regulations issued by
Federal agencies pursuant to such title.").

[23] The parties have stipulated that FJD "operates 'programs and activities' that receive
federal financial assistance, as set forth in 29 U.S.C. § 794(b)."  (Stipulation, Oct. 2, 2007.)

facie showing that reasonable accommodation is possible." *Id.* "If the plaintiff is able to meet these burdens, the defendant then bears the burden of proving, as an affirmative defense, that the accommodations requested by the plaintiff are unreasonable or would cause an undue hardship on the employer." *Id.* As there is no question that plaintiff was terminated, at issue here are the questions whether plaintiff was an "otherwise qualified individual with a disability" and whether reasonable accommodation was possible.

### A.    "Individual with a Disability"

An "individual with a disability" is defined by statute. As used in Section 504, the term means "any person who—(i) has a physical or mental impairment which substantially limits one or more of such person's major life activities; (ii) has a record of such an impairment; or (iii) is regarded as having such an impairment." 29 U.S.C. § 705(2)(B). Plaintiff asserts that all three subsections apply to her. Because whether an employee is an individual with a disability is a question of fact and the relevant facts are disputed on many fronts, I will deny plaintiff's motion for summary judgment on this issue.

### 1.    Physical or Mental Impairment

An employee's disability may be the result of a physical or mental impairment. Such impairment may be any of the following:

(A) any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems:  neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive, digestive, genito-urinary; hemic and lymphatic; skin; and endocrine; or (B) any mental or psychological disorder, such as mental

retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

45 C.F.R. § 84.3(j)(2)(i).  The impairment must "substantially limit" at least one of the employee's "major life activities," which are defined as "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Id.* § 84.3(j)(2)(ii).

"'[S]ubstantially' in the phrase 'substantially limits' suggests 'considerable' or 'to a large degree.'" *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 197 (2002).  "[U]tter inabilities" are not required, however.[24]  *Bragdon v. Abbott*, 524 U.S. 624, 641 (1998).  The Supreme Court also determined that "'[m]ajor' in the phrase 'major life activities' means important." *Toyota Motor Mfg., Ky., Inc.*, 534 U.S. at 197.  "'Major life activities' thus refers to those activities that are of central importance to daily life." *Id.*  In sum, then, "to be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most

---

[24] Regulations promulgated by the Equal Employment Opportunity Commission ("EEOC") define "substantially limits" to mean that one with an impairment is:
> (i) [u]nable to perform a major life activity that the average person in the general population can perform; or
> (ii) [s]ignificantly restricted as to the condition, manner[,] or duration under which [she] can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1).  The following factors should be considered in determining whether an individual is substantially limited in a major life activity:
> (i) The nature and severity of the impairment;
> (ii) The duration or expected duration of the impairment; and
> (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

*Id.* § 1630.2(j)(2).

people's daily lives." *Id.*  Finally, "[t]he impairment's impact must also be permanent or long term." *Id.*

Plaintiff alleges that she suffers from the following "impairments"[25]:  ITP, cirrhosis, anemia, low platelets, and interstitial lung disease.  (Pl.'s Mem. 7.)  Plaintiff alleges that, as a result of her impairments, she is substantially limited in eight major life activities:  walking, sleeping, concentrating, performing manual and household tasks, caring for herself, sexual activity, eating, and working.  (*Id.* at 9.)  Four of these activities—namely, caring for herself, performing manual tasks, walking, and working—are included in the definition of "major life activities" and so clearly are within the potential purview of Section 504.

The Third Circuit has held that impaired "concentrating and remembering (more generally, cognitive function)" may limit major life activities.  *Gagliardo v. Connaught Labs., Inc.*, 311 F.3d 565, 569 (3d Cir. 2002).  Difficulty sleeping likewise may impair a major life activity, but only if the difficulty is severe.  *See Sloan v. City of Pittsburg*, 110 F. App'x 207, 212 (3d Cir. 2004).[26]  Eating may also be a substantially limited major life activity, but Third Circuit precedent suggests that it will be substantially limited only when the limitations impinge on "life-sustaining" activity.  *See Fiscus v. Wal-Mart Stores, Inc.*, 385 F.3d 378, 384 (3d Cir. 2004).  Finally, sexual activity has also been recognized by other courts as a major life activity that may

---

[25] *See supra* notes 3-7.

[26] Although I recognize that unpublished opinions lack precedential value, I cite to them in this memorandum as persuasive authority when I find their reasoning convincing and their facts analogous to the situation before me.  *Cf. City of Newark v. U.S. Dep't of Labor*, 2 F.3d 31, 33 n.3 (3d Cir. 1993) ("Although we recognize that this unpublished opinion lacks precedential authority, we nonetheless consider persuasive its evaluation of a factual scenario virtually identical to the one before us in this case.").

15

be substantially limited.  *Reese v. Am. Food Serv.*, No. 99-1741, 2000 U.S. Dist. LEXIS 14343,

at *19 (E.D. Pa. 2000) (citing *Bragdon*, 524 U.S. at 638, 643; *McAlindin v. County of San Diego*,

192 F.3d 1226, 1234 (9th Cir. 1999)).

   In demonstrating substantially impaired major life activities, "[i]t is insufficient for

individuals attempting to prove disability status . . . to merely submit evidence of a medical

diagnosis of an impairment." *Toyota Motor Mfg., Ky., Inc.*, 534 U.S. at 198.  Instead, a plaintiff

must "prove a disability by offering evidence that the extent of the limitation [caused by their

impairment] in terms of their own experience . . . is substantial." *Id.*  (quoting *Albertson's, Inc.*

*v. Kirkingburg*, 527 U.S. 555, 567 (1999)).

   In response to deposition questions about the ways in which she was limited by her

impairments, plaintiff provided the following testimony.  She also provided relevant information

in an affidavit in support of her motion for summary judgment.

-   When plaintiff was asked about her limitations with respect to walking, she answered:
  "Due to my anemia, it would make me tired and just weak. . . . Some days were good;
  some days were bad, and it all depended on how I felt that day.  There was days that I
  stayed in bed all day."  (DeJesse Dep. 90:11-12.)  Plaintiff stated in her affidavit that she
  "was limited in how long and how far [she] could walk or engage in other strenuous
  activity due to the severe fatigue."  (DeJesse Aff. ¶ 15.)

-   When plaintiff was asked her sleeping problems, she testified:  "Sometimes at night due
  to thinking of what, you know, from previous doctor appointments and whatever that
  were said to me." (DeJesse Dep. 92:11-14.)  Plaintiff was unable to testify how often she
  had sleeping problems, and testified that lack of sleep was not a major problem, but an

16

occasional one that resolved itself.  (*Id.* at 92:21-93:17.)  Then, plaintiff clarified in her

affidavit that, "[a]s a result of the anemia, I was extremely fatigued and would take

frequent naps.  At times I was so tired that I felt like a zombie."  (DeJesse Aff. ¶ 16.)

•   When plaintiff was asked how she had problems concentrating, she said:  "Well, there

was a lot of things going on in my mind as far as my personal life with my children and

the way I felt and what could have happened and, you know, and being tired and not

feeling well.  It's hard to concentrate when you don't feel well."  (*Id.* at 94:12-19.)

•   When plaintiff was asked about performing manual and household tasks, she answered:

"I would try to, you know, clean a little, and then I would have to lay down."  (*Id.* at 95:9-

11.)  In her affidavit, she further stated:  "I was advised to avoid driving because of the

risk an accident would pose if I were to be cut or to suffer internal injuries.[27]  I was

advised to wear a helmet in the car" (DeJesse Aff. ¶ 17); "I was limited in how much I

could hold and play with my children . . . . Any sudden movements or light jostling would

cause my skin to bruise" (*id.* ¶ 18); "I avoided [playing hockey with my son] after my

blood levels dropped so low" (*id.* ¶ 19).  Plaintiff was also told to avoid activities that

would exacerbate her allergies, "such as playing outdoors, gardening, and dusting."  (*Id.* ¶

25.)

•   When plaintiff was asked how she had problems procreating, she answered, "I have no

idea.  I don't remember."  (DeJesse Dep. 96:2-3.)  When she was asked if she was aware

_____

[27] Plaintiff does not assert that driving is a major life activity that was substantially
limited.  Furthermore, the Third Circuit has concluded that driving is not a major life activity.
*See Robinson v. Lockheed Martin Corp.*, 212 F. App'x 121, 124 (3d Cir. 2007); *Sloan v. City of
Pittsburgh*, 110 F. App'x 207, 212 (3d Cir. 2004).

17

of any limitations she had in procreating, plaintiff answered, "No." (*Id.* at 96:6.) In her affidavit, plaintiff stated that she was told to avoid sexual activity when she was first diagnosed with ITP in 2000, and she avoided sex after her recurrence in 2003 based on the earlier recommendation. (DeJesse Aff. ¶¶ 20-21.)

• When plaintiff was asked about her problems eating, she responded: "Some stuff would bother me. Some foods would bother me. I had to eat a lot of vegetables because of my iron level, but the medication I was on, some stuff, you know, I wouldn't take well in my stomach." (DeJesse Dep. 96:9-14.) Plaintiff was unable, however, to recall any specific foods that did not "take well"; she testified, "Just certain—like spicy stuff." (*Id.* at 96:21-22). She further testified that her medication caused no other limits on her diet. (*Id.* at 96:15-97:17.) In her affidavit, she stated that she was "restricted with respect to the foods I could eat, particularly spicy foods, because of the risk posed by ulcers and internal bleeding." (DeJesse Aff. ¶ 34.) She also could not drink alcohol. (DeJesse Dep. 18-21; DeJesse Aff. ¶ 33.)

Defendant refers to plaintiff's medical records in support of its argument that a genuine issue of material fact exists as to whether plaintiff was actually substantially limited in the performance of any major life activity. By the end of her FMLA leave in mid-November 2003, plaintiff's medical records reflect that she felt fine and her energy level was good. (*See* Def.'s App. Ex. 2 (letter from Dr. Casey to Dr. Mintzer (Oct. 30, 2003) (reporting that "[t]he patient currently feels fine")), Ex. 3 (patient note by Dr. Mintzer (Nov. 6, 2003) (reporting that plaintiff "[f]eels fine" and "energy level good"), Ex. 6 (patient note by Dr. Mintzer (Nov. 25, 2003) (same).) Defendant suggests that plaintiff therefore was not an individual with a disability

18

because her inability to work was not permanent, and it was not sufficiently prolonged to qualify

as a "disability."  Similarly, defendant contends that the other limitations on plaintiff's major life

activities may have resolved as early as November 2003, when plaintiff's medical records

indicate that she finished taking the steroid.  (*See* Def.'s App. Ex. 6 (patient note by Dr. Mintzer

(Nov. 25, 2003) (recording that plaintiff is "[o]ff steroids"), Ex. 8 (letter to Dr. Mintzer from Dr.

Nunes (Nov. 25, 2003) (reporting that plaintiff was "treated with [p]rednisone until November

2003")).)  The limitations had clearly resolved by January 2004 when the medical testing was

completed and, plaintiff agrees, she was no longer taking a steroid.  (*See* DeJesse Dep. 90:18-

99:3.)

      "The question of whether an individual is substantially limited in a major life activity is a

question of fact."  *Williams v. Phila. Housing Auth. Police Dep't*, 380 F.3d 751, 763 (3d Cir.

2004).  The evidence referred to by both parties does not demonstrate that plaintiff has a

substantial limitation on one or more major life activities as a matter of law.[28]  Instead, genuine

---

     [28] Plaintiff points the court to *Praseuth v. Newell-Rubbermaid, Inc.*, 219 F. Supp. 2d 1157
(D. Kan. 2002), in support of her argument that she is disabled by ITP as a matter of law.
Relying on the *Praseuth* court's reasoning, however, is not sufficient.  While the court for the
District of Kansas did conclude as a matter of law that ITP constitutes an impairment, and that
working, performing manual tasks, sexual intercourse, and reproduction are major life activities,
it went no further.  It held:

     The court concludes that it cannot determine as a matter of law that plaintiff's
     condition does not substantially limit her ability to perform manual tasks.  As such,
     defendants' motion on this point must be rejected.  While the court must conclude
     that defendants cannot show that plaintiff is not disabled as a matter of law for
     purposes of their motion, the court similarly cannot conclude that plaintiff is disabled
     as a matter of law on the basis of her inability to perform manual tasks.

219 F. Supp. 2d at 1186.  With respect to the *Praseuth* plaintiff's inability to work, the court
again concluded that

     plaintiff clearly has a limitation on her ability to work.  Such limitation would be
     sufficient to preclude a judgment of non-disability, but is not sufficient to justify a
     judgment as a matter of law of disability.

issues of material fact exist as to which, if any, of plaintiff's impairments were sufficient in duration and severity to constitute an actual disability.[29]

### 2.    "Record of" an Impairment

An employee's claim of discrimination on the basis of disability under Section 504 may be based on the employee's "record of" being disabled.  An employee has a record of being disabled if she "has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities."  45 C.F.R. § 84.3(j)(2)(iii).  "A person with a record of impairment can still qualify as [an individual with a disability] even if that individual's impairment does not presently limit one or more of that person's major life activities."  *Nathanson v. Med. Coll. of Pa.*, 926 F.2d 1368, 1382 (3d Cir. 1991).

Plaintiff argues that her medical records "clearly establish a record of impairment[] as a matter of law," given her diagnoses of ITP.  (Pl.'s Mem. 18.)  The issue is not so straightforward, however, because whether plaintiff's impairments substantially limited one or more major life activities remains a question of fact, as explained above in Part III.A.1.  Further, the FJD argues that plaintiff "has not shown that any of [her medical records establishing a record of impairment] were forwarded to the FJD."  (Def.'s Mem. 8.)  Indeed, plaintiff's affidavit does not state that she forwarded these records to the FJD, and in her deposition plaintiff testifies only to

---

*Id.* at 1186-87.  In sum, "the court cannot conclude, as a matter of law, that plaintiff is disabled. Nor can it conclude that she is not disabled.  This is the consummate material question of fact for a jury to determine."  *Id.* at 1187.  I reach the same conclusion here.

[29] Because defendant has not filed a cross-motion of summary judgment, I do not decide whether any of plaintiff's alleged substantially limited major life activities are *insufficient* as a matter of law.

having sent four "medical certification forms" to the FJD prior to November 17, 2003.  (*See*

DeJesse Dep. 54:22-57:6 (form signed by Dr. Casey received by the FJD on Oct. 8, 2003), 57:17-

60:2 (form signed by Dr. Casey received by the FJD on Nov. 10, 2003), 63:19-65:11 (form

signed by Dr. Mazzatto received by the FJD on Sept. 29, 2003), 114:20-115:21 (form signed by

Dr. Casey received by the FJD on Nov. 10, 2003).)   Additionally, Judge Kelly's chief of staff

testified that she was aware plaintiff had a "blood disorder," but was not aware of any particular

diagnosis; she only knew of the blood disorder because she overheard plaintiff talking in the

office.  (Fenerty Dep. 21:22-25:2.)  Judge Kelly also was not aware of the nature or extent of

plaintiff's condition.  (Kelly Dep. 33:13-35:8.)

Therefore, there is a genuine issue of material fact as to whether the FJD could reasonably

have known about plaintiff's alleged record of impairment.  *See Nathanson*, 926 F.2d at 1382

(finding an issue of fact as to whether a medical school had notice of a student's impairment); *cf.*

*Hedberg v. Ind. Bell Telephone Co.*, 47 F.3d 928, 932-33 (7th Cir. 1995) (holding that an

employer must have notice of an employee's disability for the employee to have a disability

discrimination claim under the ADA).


### 3.    "Regarded As" Having an Impairment

The regulations promulgated to explain Section 504 indicate that being "regarded as

having an impairment" means that the employee either:

> (A) has a physical or mental impairment that does not substantially limit major life
> activities but that is treated by a recipient as constituting such a limitation; (B) has
> a physical or mental impairment that substantially limits major life activities only as
> a result of the attitudes of others toward such impairment; or (C) has none of the
> impairments defined in paragraph (j)(2)(i) of this section but is treated by a recipient

as having such an impairment.

45 C.F.R. § 84.3(j)(2)(iv).  The analysis focuses on the information the employer has regarding

the employee's condition and the employer's response to that information.  *Buskirk v. Apollo*

*Metals*, 307 F.3d 160, 167 (3d Cir. 2002).  "[I]n general, an employer's perception that an

employee cannot perform a wide range of jobs suffices to make out a 'regarded as' claim."

*Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 188 (3d Cir. 1999).  But "the mere fact that an

employer is aware of an employee's impairment is insufficient to demonstrate either that the

employer regarded the employee as disabled or that that perception caused the adverse

employment action."  *Kelly v. Drexel Univ.*, 94 F.3d 102, 109 (3d Cir. 1996).

Plaintiff asserts that "[t]here is no dispute of fact that [d]efendant knew [p]laintiff had

ITP and other related impairments."  (Pl.'s Mem. 16.)  In support of this assertion, plaintiff

points to the following portions of the record:  plaintiff's testimony that, from April 2003 to

September 2003, her condition continued to worsen and she became so tired and weak that she

would sometimes fall down[30] and had to take naps throughout the day (DeJesse Dep. 53:11-17);

plaintiff's testimony that a traffic court personnel officer would ask plaintiff how she felt and

how her tests went because the personnel officer was aware of plaintiff's ITP and "was always

very concerned about it" (*id.* 108:2-3, 141:22-142:4); the personnel officer's testimony that she

knew plaintiff had a "blood disorder" (D'Emilio Dep. 125:16-21, 127:12-14, 136:23-24); and

---

[30] Plaintiff's testimony was as follows:  "I was very tired I was very weak, I would fall—I
would take naps throughout the day." (DeJesse Dep. 53:15-17.)  Plaintiff construes this
statement to mean that she would fall down.  (Pl.'s Statement Undisputed Facts ¶ 21.)  Defendant
does not contest this construction.  (Def.'s Resp. to Pl.'s Facts ¶ 21.)  I note that it more likely
that plaintiff was about to say "fall asleep."  Nowhere else in the record before me is there a
mention of plaintiff stumbling.

22

testimony of Judge Kelly's chief of staff that she was aware of plaintiff's "blood disorder" (Fenerty Dep. 91:6-8).

As defendant points out, however, FJD employees also stated that they did not really understand what the term "blood disorder" meant, and they did not consider it to be a disability. (Def.'s Mem. 8.)  Plaintiff's supervisor testified that he did not know if a blood disorder was the reason for plaintiff's FMLA leave.  (Travelina Dep. 20:22-21:7, July 19, 2007.)  The traffic court personnel officer testified that she did not know what "ITP" or "sarcoidosis" meant, and she did not understand plaintiff to have a "disablity."  (D'Emilio Dep. 42:22-43:13, 136:13-24.)  Judge Kelly's chief of staff did not equate the term "blood disorder" with a "medical condition." (Fenerty Dep. 27:14-28:15, 90:13-91:8.)  Furthermore, she testified that she always knew plaintiff to be a "ball of energy."  (*Id.* at 95:11-97:10.)  Finally, Judge Kelly testified that he did not know plaintiff had a blood disorder, and he did not know why she was out on sick leave other than because "she was having some kind of a test or something."  (Kelly Dep. 33:13-34:15.) Thus, a genuine issue of material fact indisputably exists as to the extent of the FJD's knowledge of plaintiff's impairments.

### B.    "Otherwise Qualified"[31]

A disabled employee suing his employer pursuant to Section 504 has the burden to prove that she is an "otherwise qualified individual."  *Shiring*, 90 F.3d at 832.  An otherwise qualified individual is an employee who can perform the essential functions of her job with or without accommodation.  *Id.*  Two questions must be answered in the affirmative to conclude that an

---

[31] For purposes of this section, I assume plaintiff is disabled.

employee is "qualified":  first, whether "the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc."; and second, whether "the individual can perform the essential functions of the position held or desired, with or without reasonable accommodation."  29 C.F.R. Pt. 1630, App. § 1630.2(m).

Because plaintiff worked as a secretary for the FJD from 1993 through 2003, she clearly "satisfies the prerequisites for the position," and the parties do not dispute that issue.  *See Taylor*, 174 F.3d at 152 ("Because [the employee] held her position . . . for many years, receiving high praise, there is no serious dispute that she satisfies the prerequisites for the position.").  Thus the question here is whether plaintiff has shown that she could perform the essential functions of her position with reasonable accommodation—i.e., by taking an extended medical leave beginning November 18, 2003.  Plaintiff argues that granting her request for extended leave "would have been a reasonable accommodation because her temporary leave of absence would have allowed her doctors to develop an effective treatment and such an accommodation would not have created an undue burden" on the FJD.  (Pl.'s Mem. 19.)

In the Third Circuit, a leave of absence may be a reasonable accommodation.  *Fogleman v. Greater Hazleton Health Alliance*, 122 F. App'x 581, 585 (3d Cir. 2004).  The Third Circuit has observed, however, that "the federal courts that have permitted a leave of absence as a reasonable accommodation under the ADA have reasoned, explicitly or implicitly, that applying such a reasonable accommodation at the present time would enable the employee to perform his essential job functions in the near future."  *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 151 (3d Cir. 2004).  Thus, if there is no evidence that the requested leave would allow the

24

employee to "perform [her] essential job functions within a reasonable amount of time," *Fogleman*, 122 F. App'x at 586, then the requested accommodation is not reasonable.  Even plaintiff acknowledges that leave for an "indefinite" period of time is not a reasonable accommodation.  (Pl.'s Mem. 25.)  Requested leave for an "indefinite and open-ended period of time . . . . does not constitute a reasonable accommodation." *Fogleman*, 122 F. App'x at 586.

The parties dispute the nature of plaintiff's requested leave.  Plaintiff argues that her request was reasonable because it was for a temporary time period.  Plaintiff refers to the letter she submitted to Judge Kelly, which asks for an extension "until the outcome of my test."[32]  (*See* DeJesse Dep. Ex. 9 (letter to Judge Kelly from DeJesse, Nov. 17, 2003).)  She also points to witnesses' testimony that they understood plaintiff to have requested temporary leave:  the FJD employee who oversaw family medical leave testified that "everyone thought [plaintiff's leave] would be a few days" (Woodley Dep. 66:15-21); Judge Kelly testified that he understood plaintiff to be requesting a month of leave (Kelly Dep. 46:7-20;  *see also* D'Emilio Dep. Ex. 7.)

While the FJD may have understood plaintiff's request to have been for *temporary* leave, no one seems to have understood her request to have been for leave for a *definite* time period.  The factual dispute regarding the duration of plaintiff's requested leave illustrated in the previous paragraph makes this clear.  Generally, "[t]he question of whether a proposed accommodation is reasonable is a question of fact." *Buskirk v. Apollo Metals*, 307 F.3d 160, 170 (3d Cir. 2002).  Therefore, it cannot be said that plaintiff's requested accommodation is, as a matter of law,

---

[32] Plaintiff's "test"—her liver biopsy—was performed on November 19, 2003.  (*See* Def.'s App. Ex. 17.)  Plaintiff received the results of the biopsy on November 25, 2003.  (DeJesse Dep. 156:1-157:2.)

25

reasonable.[33]  At this time, a genuine issue of material fact exists and plaintiff cannot establish as a matter of law that she was a qualified individual.  Thus I will deny summary judgment on this issue.

C.      **Participation in the Interactive Process**[34]

"[A]n employer discriminates against a qualified individual with a disability when the employer does 'not mak[e] reasonable accommodations to the known physical or mental limitations of the individual unless the [employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the [employer].'"  *Taylor v. Phoenixville Sch. Dist.*, 174 F.3d 142, 151 (3d Cir. 1999) (quoting 42 U.S.C. § 12112(b)(5)(A)). To determine the appropriate reasonable accommodation, the employer should initiate the

---

[33] In addition to her argument that the requested leave extension was a reasonable accommodation, plaintiff argues that extended leave would not have created an undue burden on the FJD.  "Following a prima facie showing by the plaintiff that a reasonable accommodation exists which would make her qualified, the burden shifts to the defendant to prove either that the accommodation is unreasonable or that it creates an undue hardship for the defendant."  *Walton v. Mental Health Ass'n of Se. Pa.*, 168 F.3d 661, 670 (3d Cir. 1999).  "These two options before the defendant effectively 'merge' because 'in practice meeting the burden of nonpersuasion on the reasonableness of the accommodation and demonstrating that the accommodation imposes an undue hardship amount to the same thing.'"  *Id.* (quoting *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 138 (2d Cir. 1995)).

Given the genuine issues of material fact with respect to the reasonableness—i.e., definiteness—of plaintiff's requested extension of leave, as well as the interaction between the unreasonableness of and burden imposed by a proposed accommodation, I will likewise deny summary judgment on this issue.

[34] For purposes of this section, I assume plaintiff is an "otherwise qualified individual with a disability."

26

interactive process.  *See* 29 C.F.R. § 1630.2(o)(3).[35]  "Once a qualified individual with a

disability has requested provision of a reasonable accommodation, the employer must make a

reasonable effort to determine the appropriate accommodation.  The appropriate reasonable

accommodation is best determined through a flexible, interactive process that involves both the

employer and the [employee] with a disability."  29 C.F.R. Pt. 1630, App. § 1630.9.  Both parties

bear responsibility in this process.  *Taylor*, 184 F.3d at 312; *Mengine v. Runyon*, 114 F.3d 415,

420 (3d Cir. 1997).  The Third Circuit explained that:

> [B]oth parties bear responsibility for determining what accommodation is necessary
> . . . "[N]either party should be able to cause a breakdown in the process for the
> purpose of either avoiding or inflicting liability.  Rather, courts should look for signs
> of failure to participate in good faith or failure by one of the parties to help the other
> party determine what specific accommodations are necessary.  A party that obstructs
> or delays the interactive process is not acting in good faith.  A party that fails to
> communicate, by way of initiation or response, may also be acting in bad faith.  In
> essence, courts should attempt to isolate the cause of the breakdown and then assign
> responsibility."

*Taylor*, 184 F.3d at 312 (quoting *Bultemeyer v. Fort Wayne Cmty. Schs.*, 100 F.3d 1281, 1285

(7th Cir. 1996)).

An employee-plaintiff demonstrates that her employer failed to engage in the interactive

process by showing (1) "the employer knew about the employee's disability"; (2) "the employee

requested accommodations or assistance for his or her disability"; (3) "the employer did not

---

[35] This ADA regulation is applicable to claims brought under the Rehabilitation Act.  *See*
*Taylor*, 184 F.3d at 312 & n.5.  The complete text of the regulation is as follows:

> To determine the appropriate reasonable accommodation it may be necessary for the
> covered entity to initiate an informal, interactive process with the qualified individual
> with a disability in need of the accommodation. This process should identify the
> precise limitations resulting from the disability and potential reasonable
> accommodations that could overcome those limitations.

29 C.F.R. § 1630(o)(3).

make a good faith effort to assist the employee in seeking accommodations"; and (4) "the employee could have been reasonably accommodated but for the employer's lack of good faith." *Taylor*, 184 F.3d at 319-20.  As explained above, *see supra* Part III.A.2-3, a genuine issue of material fact exists with respect to whether the FJD had "adequate notice of [plaintiff's] disability," *Taylor*, 184 F.3d at 319.

A genuine issue also exists with respect to whether plaintiff properly requested her desired accommodation and whether the FJD made a good faith effort to assist plaintiff.  This is so because the FJD already had in place the type of accommodation plaintiff was requesting—i.e., extended medical leave was available.  (*See* Def.'s App. Ex. 22.)  Plaintiff was instructed by the FJD that to receive a future extension of her medical leave she had to submit a request to her supervisor "as soon as practicable," "along with medical certification."  (*Id.*)  There is no dispute that plaintiff failed to follow the instructions in the letter, for she did not submit a new medical certification form with her letter requesting extended leave.[36]  (*See* DeJesse Dep. 123:2-124:9.)  But plaintiff disputes whether she was actually required to submit medical certification along with her request:  plaintiff seems to argue that, in spite of the specific instructions in the October 30 letter, no certification was required because no one she spoke with about her leave request told her to include a certification form with her letter (*see, e.g.*, DeJesse Dep. 118:19-119:4, 167:17-168:11; D'Emilio Dep. 68:18-69:3; Woodley Dep. 85:18-86:20, 105:14-106:18); the FJD argues that plaintiff did not follow proper procedure by failing to submit medical certification (*see, e.g.*, Woodley Dep. 85:9-17.)  Given this material factual

---

[36] Plaintiff is also correct that various FJD employees were aware that she had requested, in a letter to Judge Kelly, time off for a medical test.  (*See* DeJesse Dep. 138:7-12; Fenerty Dep. 23:17-33:17; Travelina Dep. 22:2-6; Woodley Dep. 45:22-46:3.)

dispute, summary judgment would be inappropriate.  *Cf. McLaughlin v. City of Atlantic City*, 143

F. App'x 402, 404 (3d Cir. 2005) (concluding that the plaintiff "did not participate in good faith

in the interactive process" because, "[a]lthough he provided a letter from his doctor . . . , he

ignored the defendants' requests for further evaluation to determine whether suitable

accommodations could be made."); *Cehrs v. Ne. Alzheimer's Research Ctr.*, 155 F.3d 775, 783

(6th Cir. 1998) (concluding that granting the employer's motion for summary judgment would be

inappropriate given the genuine issue of material fact as to whether the employer could "justif[y]

its termination of [plaintiff's] employment on the basis that [plaintiff] failed to follow the

company's procedure for extending a leave of absence").


**IV.     Conclusion**

        Given the genuine issues of material fact outlined in this memorandum, I clearly cannot

conclude as a matter of law that plaintiff was disabled under Section 504, that she was

"otherwise qualified," that the extended leave she requested was a "reasonable accommodation,"

or that the breakdown in the interactive process can be blamed on the FJD.[37]  Therefore, I will

deny plaintiff's motion for summary judgment.

        An appropriate order follows.

---

        [37] Indeed, based on the facts presented by the parties, and particularly the medical reports,
it seems more likely that a motion for summary judgment by the defendant would have been
granted, had it been filed.

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| STEPHANIE DEJESSE, | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 06-1682 |
| FIRST JUDICIAL DISTRICT OF PENNSYLVANIA, | : | |
| Defendant. | : | |
| | : | |

## Order

AND NOW, this _____ day of December 2007, upon consideration of the summary

judgment motion of plaintiff Stephanie DeJesse (Docket No. 25) and defendant First Judicial

District's response thereto, IT IS HEREBY ORDERED that the motion is DENIED.

IT IS FURTHER ORDERED that trial is scheduled for March 17, 2008 at 10:00 a.m.


_____ s/ William H. Yohn Jr. _____
William H. Yohn Jr., Judge